UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRAD NORMAN, | CASE NO. 20-CV-01250-LK |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| TRAVELERS INDEMNITY COMPANY, | |
| Defendant. | |

Plaintiff Brad Norman sued Travelers Indemnity Company to collect on an underinsured motorist policy after he was injured in an automobile collision. *See generally* Dkt. No. 1-1. He contends that the amount paid out by the at-fault driver's insurer does not adequately compensate the noneconomic damages stemming from his mild traumatic brain injury. Dkt. No. 36 at 6, 12–13. Travelers disagrees. Dkt. No. 38 at 11. Although Norman originally advanced a handful of claims against Travelers for its alleged deficient handling and denial of his claim, the parties settled those relatively early on—leaving only Norman's breach of contract claim. *See* Dkt. No. 1-1 at 5–10 (complaint); Dkt. No. 14 at 1–3 (stipulation of dismissal); Dkt. No. 15 at 1 (order granting stipulation). The Court twice rejected the parties' demand for a jury trial as untimely and therefore

waived. *See* Dkt. Nos. 13, 18, 20–21. The parties then proceeded to a two-day virtual bench trial on Norman's breach of contract claim. *See* Dkt. Nos. 35, 46, 50.

Norman submitted nine exhibits and presented eight lay witnesses consisting of family members and employees. *See* Dkt. No. 52 at 1 (Exs. 1–9); Dkt. No. 51 at 1 (listing witnesses called). He also tendered the perpetuation deposition testimony of Dr. Martha Glisky, a clinical neuropsychologist. *See* Ex. 9. Travelers submitted eight exhibits, including the perpetuation deposition testimony of neuropsychologist Dr. Howard Lloyd. *See* Dkt. No. 52 at 1–2 (Exs. 100–107). Having heard the testimony of the witnesses, considered the exhibits in evidence, and reviewed the post-trial briefs, the Court enters the following findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1).[1]

## I.   FINDINGS OF FACT

1.0   <u>Brad Norman: Family Background and Cognitive Functioning Before the February 2017 Crash</u>

      1.1   Brad Norman was born on August 21, 1958. Dkt. No. 37 at 2. He was therefore 58 years old at the time of the automobile collision at issue (February 2017), and 64 years old at the time of trial (November 2022). Norman has a high school degree and three children from a previous marriage: Carl, Calli, and Abby Norman. *Id.*; Dkt. No. 53 at 5. He met his current wife, Julie Norman, in late 2006 and married her in 2010. Dkt. No. 53 at 5.

      1.2   Norman was involved in at least four accidents prior to the February 2017 automobile collision at issue.

      1.3   When he was 15 years old, Norman was taken to the hospital after an "off-

---

[1] To the extent any of the Court's findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent any of the Court's conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

trail" motorcycle incident. *Id.* at 19. He was not treated for any injuries, though, and he "walked out" within an hour or two. *Id.*

1.4     In 1975, Norman was a passenger in a car on his way to an early morning swim practice when the driver (who was not speeding) lost control and collided with a telephone pole. *Id.* at 20. Norman was not wearing a seat belt. *Id.* However, he sustained "[v]ery little, if any" injuries and testified that "somebody's mom" picked them up and dropped them off at school. *Id.* ("I wasn't late for my first class, and then just carried on, and there w[ere] never any other issues.").

1.5     In 2008, Norman was struck in the head by a Bobcat bucket at a worksite. *Id.* at 22; Ex. 9 at 65. The Bobcat bucket, which was positioned "slightly" over Norman's head, moved when he attempted to "hook[] something up to it." Dkt. No. 53 at 22. The bucket apparently hit his hard hat, which in turn "crammed [his] neck" such that Norman "heard . . . a couple of little cracks, like when you crack your neck, you know, and it didn't feel good[.]" *Id.* ("It wasn't a metal-to-bone or scalp impact."). Norman "worked out" the pain over the course of a "few sessions" with his chiropractor, Dr. George Lawrence. *Id.* He reported headaches during his treatment with Dr. Lawrence. *Id.* at 83.

1.6     Dr. Lawrence has treated Norman since October 2004. *Id.* at 83–84. At his initial visit, Norman reported having "issues with blurred vision at the end of the day," sensitivity to light, ringing in the ears, moodiness, and memory problems. *Id.* at 84–85, 88–89.

1.7     The final pre-2017 accident occurred in 2010. *Id.* at 21. A vehicle rear-ended Norman's truck while he was idle at a stoplight, causing him to hit his head against the rear window. *Id.* ("[I]t was, you know, like any rear-end crash, head went back and then, of course, forward a little bit[.]"); *see also id.* at 24 ("[W]hatever speed they were

going, they did not brake. They simply—whatever speed it was, 25 or 30 in that area, they somehow or another, just simply ran into us. There was no braking by them. It was just a clear impact.") *id.* at 73, 79. Norman felt "dazed and nauseated" afterwards. *Id.* at 79–80. And his truck was "totaled." *Id.* at 79.

1.8    Norman testified that nothing about these prior incidents affected his short- or long-term memory or otherwise "disrupt[ed his] normal way of thinking [and] looking at things[.]" *Id.* at 23; *see also id.* at 117–18.

1.9    Indeed, one his "strongest assets" was his memory. *Id.* at 42. Norman characterized his short-term memory as "instant recall" and claimed that he could "remember thousands of phone numbers" and "remember schedule boards without having to write them down." *Id.*; *see also id.* at 47 ("I didn't have any issues with . . . knowing that something was scheduled or so-and-so called or that this or that. I truly was and have been blessed with the ability to categorize in my mind a certain way[.]").

2.0    Olympic Concrete Cutting, the February 2017 Collision, and Travelers' UIM Policy

2.1    Norman has owned and operated Olympic Concrete Cutting since 2011. *Id.* at 12. It is a small business with "five or six" employees. *Id.* at 13. Olympic Concrete performs commercial, industrial, and residential jobs that are both "very minor" and "extremely major." *Id.* at 14–15; *see also id.* at 15 ("And SpaceX or Boeing or Amazon buildings, I mean, again, those are large clients, and then there are smaller clients. We work on all manners of projects.").

2.2    On February 3, 2017, Norman and one of his employees, Eric Weikal, were traveling home on Highway 101 from Forks to Port Angeles. *Id.* at 24–25. Norman was driving them in a company truck. *Id.* at 25.

2.3    Travelers insured the truck through a policy that included underinsured

motorist benefits. Dkt. No. 38 at 8; *see also* Dkt. No. 1-1 at 3 ("Brad Norman fully paid insurance premiums for underinsured motorist (UIM) coverage from defendant Travelers for insurance policy number BA-4A033411-16-SEL[.]").

2.4    Conditions were "chilly and wet," and snow was accumulating. Dkt. No. 53 at 25. As Norman and Weikal neared Lake Crescent, the driver of a Jeep heading in the opposite direction lost control, crossed the center line of the road, and struck the front end of the truck in a "T-bone" position. *Id.* at 25–26; *see also id.* at 187–89 (Weikal describing the accident).

2.5    The impact was "horrendous" according to Norman. *Id.* at 26; *see* Ex. 1 (photographs from scene depicting Norman's truck and T-boned Jeep); Ex. 2 (photograph depicting the front of Norman's truck); Ex. 3 (same, different angle); Ex. 4 (same, different angle); Ex. 5 (photograph depicting shattered driver's side back window); Ex. 6 (same, different angle); Ex. 7 (photograph depicting slight warping of truck bed wall on driver's side).

2.6    Weikal testified that their vehicle was traveling "between 30 and 35" miles per hour at the point of impact with the Jeep. Dkt. No. 53 at 188; *see also id.* at 189 ("Both vehicles were totaled.").

2.7    Although Norman could not gauge exactly how long, he claims that he was "briefly unconscious" for anywhere between 10 and 30 seconds. *Id.* at 26; *see also id.* at 27 ("I did have a state of unconsciousness, because there was, I guess, an awareness that— I, actually, thought I died in the crash."). Norman told his wife that he lost consciousness after the accident. *Id.* at 212.

2.8    Weikal was more equivocal as to whether he or Norman lost consciousness:

I was looking forward, and then everything went black for just a second. I

> don't know if I closed my eyes or if I legit blacked out, but I remember
> seeing it hit, and then I remember opening my eyes and . . . just shaking my
> head a little, looking around, and I see Brad, kind of, coming to, doing the
> same, looking around and being dazed and stunned.

*Id.* at 192; *see also id.* at 193 (Q: "He was not knocked out in the sense that—you didn't

have to wake him up or shake him or anything, right?" A: "I do not remember having to

do that, no.").

2.9     Thus, there is conflicting information on whether Norman lost

consciousness following the collision. Dr. Glisky suggested that Norman could have

experienced a brief period of post-traumatic amnesia, which is the "loss of memory

surrounding the event just after the event." Ex. 9 at 74 ("So sometimes people say they lost

consciousness because they have a blank period in their memory, and he did describe a

blank period where he thought he lost consciousness."). In any event, Dr. Glisky made

clear that an individual need not experience prolonged loss of consciousness to receive a

mild traumatic brain injury diagnosis. *Id.* at 7; *see also id.* at 10 ("[T]here doesn't have to

be loss of consciousness, but it's sort of like a loss of memory. People aren't sure of a

couple minutes around the event or feeling dazed, confused, [and] foggy[.]").

2.10    An emergency crew responded to the accident but did not transport Norman

or Weikal to the hospital. Dkt. No. 53 at 27–28. In fact, transportation in an ambulance

"wasn't even suggested." *Id.* at 28. Julie Norman picked up the two men and brought them

home. *Id.* at 28–29.

2.11    Norman was not at fault to any degree for the accident. *See* Dkt. No. 38 at

1–2.

3.0    <u>February – August 2017: Initial Aftermath and Treatment</u>

3.1     Norman did not see a doctor until two weeks after the accident, when an

"extremely insistent" neighbor convinced him to get evaluated. Dkt. No. 53 at 31, 92–93. At that point, he was "still shaken up" and had "some memory issues" and lower back and neck pain. *Id.* at 32. Norman sought treatment at Olympic Medical Center. *Id.* He also underwent diagnostic testing (including a CT scan), the results of which were "normal." Ex. 8 at 11–12; *see also* Dkt. No. 53 at 93; Ex. 107 at 24. Norman was discharged the same day. Dkt. No. 53 at 93.

3.2     Dr. Glisky testified that an individual can have a "normal" CT scan and still have a mild traumatic brain injury. Ex. 9 at 68. In fact, "[y]ou're almost required to have a normal CT for [the diagnosis] to not move into a different category of brain injury." *Id.*

3.3     Between February and June 2017, Norman sought "general chiropractic care" from Dr. Lawrence. Dkt. No. 53 at 33–34; *see also id.* at 93. Treatment spanned 15 visits. *Id.* at 93. Although Norman reported memory issues to Dr. Lawrence, in March, April, and May 2017, he indicated that his memory was improving. *Id.* at 94–95. Dr. Lawrence nonetheless referred Norman to Dr. Robert Rubenstein, a neurologist, because he continued to report difficulties with his short-term memory. *Id.* at 34, 95.

3.4     Norman's physical injuries stemming from the February 2017 collision (headaches, neck pain, low back pain, left shoulder pain, and pelvic pain) resolved within three to six months of the accident. *Id.* at 94.

3.5     Dr. Rubenstein examined Norman in August 2017. Ex. 8 at 16, 22; Ex. 9 at 69. Although Norman does not recall receiving a specific diagnosis, he recalls that Dr. Rubenstein told him that his brain was "damaged." Dkt. No. 53 at 35–36, 117. Dr. Rubenstein diagnosed Norman with post-concussion syndrome and suggested that he be evaluated by a speech therapist skilled in dealing with cognitive rehabilitation. Ex. 8 at 16; Ex. 9 at 72–73; Ex. 107 at 18.

3.6     Norman did not pursue any remedial treatment for his memory issues. Dkt. No. 53 at 96; *see also* Ex. 107 at 33; Ex. 9 at 73.

4.0   <u>August 2017 – September 2018: the Post Driver Incident and Continued Memory Issues</u>

4.1     In late August 2017, Norman was struck in the head by a 20-pound metal fence post driver while working on his property. Dkt. No. 53 at 36, 97, 108–09 (describing incident); *see also* Ex. 106 (representative model of fence post driver).

4.2     The fence post driver was dropped from "a few feet" above him, and he was not wearing a hard hat. Dkt. No. 53 at 97–98. He does not recall losing consciousness from the impact or experiencing any change in his memory problems. *Id.* at 36–37. However, medical records indicate that Norman did lose consciousness, and doctors ended up sealing his scalp laceration with staples. *Id.* at 36–37, 99; Ex. 9 at 80–81. Doctors did not administer any CAT scans, MRIs, or other diagnostic tests. Dkt. No. 53 at 119; Ex. 9 at 21. However, a doctor's note from Norman's hospital visit suggests that the treating physician suspected a skull fracture and traumatic brain injury. Ex. 9 at 80.

4.3     Norman has experienced "constant" issues with his short-term memory since the accident. Dkt. No. 53 at 41.

5.0   <u>Dr. Glisky's September 2018 Examination</u>

5.1     Norman's attorneys referred him to Dr. Glisky for an examination in September 2018. *Id.* at 37, 80, 96; Ex. 9 at 14.

5.2     Norman underwent testing designed to measure his short-term memory. Dkt. No. 53 at 38–41; *see* Ex. 9 at 22–23 (describing September 2018 evaluation, including one-hour interview and five to six hours of testing).

5.3     He performed "poorly" on these tests and was "extremely shocked" by his inability to recall simple details from the morning session. Dkt. No. 53 at 40 ("And I know

that I was giving it everything I could, but they were asking me the simplest questions in the afternoon, and I couldn't remember exactly how to do it again. I was—I was not—I was not succeeding, that's for sure.").

5.4     Dr. Glisky's testimony corroborates Norman's recollection. She indicated that Norman performed "significantly below average on most memory tests" compared to his age cohort and despite being "above average" for other abilities. Ex. 9 at 24–25; *see also id.* at 25 ("We have percentiles at the 9th percentile, the 16th percentile, 21st percentile, and some even as low as below the 1st percentile. So, overall, his memory abilities were a notable area of—of weakness, and that included visual memory as well as auditory or verbal memory."). When tasked with paying attention to two things at once or "switch[ing] back and forth between two things," Norman's attention "went down significantly." *Id.* at 28. Specifically, he went from the "66th and 84th percentile on simple attention tasks" to the "10th percentile on one visual attention task" and "the 20th and 30th percentiles on th[e] divided attention task when it was auditory." *Id.* at 28–29.

5.5     As for Norman's psychological and personality functioning, the testing did not reflect significant depression or anxiety. *Id.* at 31–32 ("[H]e had . . . some minor symptoms, but they weren't significant."). Nonetheless, based on reports about "frustration difficulties," Dr. Glisky diagnosed Norman with adjustment disorder. *Id.* at 32.

5.6     Dr. Glisky opined that Norman meets the criteria for mild neurocognitive disorder due to traumatic brain injury. *Id.* at 16. She also found that his disorder and the attendant cognitive deficits resulted from the February 2017 collision. *Id.*

5.7     Norman did not tell Dr. Glisky about the 1975 or 2010 accidents. Dkt. No. 53 at 80–81, 96; Ex. 9 at 63, 77–78, 84. Nor did he tell her about the August 2017 post

driver incident. Dkt. No. 53 at 96; *see* Ex. 9 at 18, 78.[2]

5.8     However, Dr. Glisky has since reviewed the August 2018 medical records associated with Norman's post driver head injury, and she testified that they do not alter her opinion. Ex. 9 at 18; *see also id.* at 19 ("Nobody thought it was a traumatic brain injury. There was no evidence of any lasting symptoms other than the laceration. The other neuropsychologists also indicated that it was not of relevance, and so it was . . . an incidental event that . . . had no bearing on his brain."); *id.* at 19–21 (explaining that motor vehicle collisions or "football-type" injuries are worse than hits to the top of the head because in the former scenario the brain rocks back and forth in the skull, while in the latter scenario the brain is not impacted absent "tremendous force").

5.9     Dr. Glisky confirmed that multiple hits to the head can aggravate a brain injury. *Id.* at 31. And she "could not rule out" the post driver incident as a contributor to her diagnoses. *Id.* at 30–31. She made clear, however, that there was never a point at which she believed the post driver incident accounted for her findings. *Id.* at 31. Nothing in Norman's medical records suggested that the post driver hit "was any type of concussive injury." *Id.* Dr. Glisky was accordingly "doubtful that [it] had played any role" in Norman's test results. *Id.*; *see also id.* at 82 (Q: "[Y]our opinion today is you don't think that the August 28, 2017 . . . metal post hole digger hitting Mr. Norman on the head contributed at all to the cognitive deficits that you found on testing[?]" A: "[Y]es.").

---

[2] There was conflicting testimony as to which accidents Norman told Dr. Glisky about at the initial September 2018 evaluation. Norman suggested that he told Dr. Glisky about the 1975 motorcycle accident. *See* Dkt. No. 53 at 96 (Q: "And we've already discussed the fact that you didn't discuss any other accident, *other than the one of 1975*, the motorcycle accident, because you didn't remember those at the time?" A: "That's right." (emphasis added)). Dr. Glisky, however, suggested that she was not made aware of the 1975 "head-on collision" until much later. *See* Ex. 9 at 84 (Q: "[O]ther than the prior motor vehicle accident in, I think, 1973, you weren't aware of the 1975 head-on collision; correct?" A: "Correct."). As discussed below, this discrepancy is immaterial because Dr. Glisky testified that her subsequent knowledge of the accidents did not change her opinion.

5.10    The Court nonetheless finds Dr. Glisky's testimony on this point somewhat suspect. After emphatically stating that the post driver incident did not contribute to Norman's cognitive deficits, Dr. Glisky conceded that there was "no way to determine" whether or to what degree Norman's other head injuries "played a contributory role" in the cognitive deficits revealed during her September 2018 testing. *Id.* at 83–85; *see also id.* at 87 ("There's no way, even if I had extensive records, to know which played a role from a percentage basis. We are not a science that can divide them up and go, ['t]his one is 20 percent. This one is 20 percent.[']").

5.11    Dr. Glisky indicated that neuropsychologists must instead look for changes in the individual's condition (e.g., complaints of memory problems) following the head injury at issue. *Id.* at 85–86; *see also id.* at 87 ("[W]hat we look at is what changes occurred and what is the most-likely factor to have indicated those changes."). And here, the February 2017 collision played a more notable role "because that's when things appeared to change more significantly." *Id.* at 86; *see also id.* at 85–86 ("He and his wife didn't complain of any cognitive issues, and [then] they complained that something notably changed as of that date. And the medical records started showing memory complaints, memory complaints, memory complaints.").

5.12    The Court therefore finds Dr. Glisky's rephrased opinion more convincing: "[T]his motor vehicle collision is a major and the primary contributing factor to the symptoms that I see on my testing." *Id.* at 87; *see also id.* at 88 (indicating that she could not "rule out other minor or other contributory causes").

6.0    Dr. Glisky's Recommendations Following September 2018 Evaluation

6.1    Dr. Glisky recommended cognitive rehabilitation, mental health counseling,

and a follow-up neuropsychological evaluation. Ex. 9 at 34–35.[3]

6.2    Cognitive remediation is unlike "casting a broken bone"; rather it is "an exercise for the brain." Ex. 9 at 34–35 ("So it's more like you sprain your ankle, and if you go to physical therapy, they can strengthen it, they can maybe strengthen things around it. Maybe the ligament itself is torn and you . . . can strengthen around it so that the ankle is more stable."). Cognitive therapists "provide information and ideas about . . . types of compensatory strategies, maybe provide some kind of exercises to help out with the areas of deficit, and—and how to manage those in daily life." *Id.* at 35 (strategies include taking notes and keeping a calendar).

6.3    According to Dr. Glisky, these strategies "can help . . . some people," but "not necessarily all" people. *Id.* at 34–35; *see also id.* at 89–90 (agreeing that it "is reasonable for someone to pursue" cognitive rehabilitation because it "could benefit the person").

6.4    Although Norman testified on cross-examination that he did not read Dr. Glisky's report and does not even recall "seeing it in any detail," Dkt. No. 53 at 102–04,[4] the Court does not find this credible. In a deposition, Norman testified that he received the clinical results of Dr. Glisky's examination, Dkt. No. 53 at 103, and on direct examination, he stated that a later examination "revealed the same thing" as Dr. Glisky's first evaluation, *id.* at 45.

---

[3] The record is unclear as to what exactly Dr. Glisky recommended. The parties at certain points refer to "cognitive rehabilitation," while Dr. Glisky testified about "cognitive remediation." It is likewise unclear whether there is a material difference between the two.

[4] Dr. Glisky testified that she did not go over the testing results with Norman following the September 2018 evaluation because it was a "legal evaluation" rather than a "clinical evaluation." Ex. 9 at 34 ("I simply passed my recommendation on . . . in my written form and d[id]n't review them with him."). On cross-examination, she referred to the September 2018 and January 2020 evaluations (the latter is discussed in more detail below) as "forensic" examinations. *Id.* at 50–51.

6.5     Norman testified that he did not seek out any form of counseling to help with his memory problems because he is under the impression that "there is no repairing the brain" once it is injured. *Id.* at 61. Norman reiterated this belief throughout his testimony:

> Q: And then, finally, is it true that you have really not followed up on any type of treatment, because your understanding, from talking to Dr. Rubenstein and Dr. Glisky, is that once you're damaged, you're done?
>
> A: Those were the words they told me, yes.
>
> Q: And that's what you took away from it, that once you were damaged, you were done, and there was really nothing else you could do; is that right?
>
> A: That was my impression at the time, that's right.

*Id.* at 117.

7.0     Norman After the February 2017 Accident: Personal Reflections, Adjustment Strategies, and Family and Employee Testimony

7.1     Norman was "horrified," "mortified," "shaken to [his] core," and "devasted beyond belief" to learn from Dr. Glisky's testing what the February 2017 collision "has truly caused." *Id.* at 40; *see also id.* at 41 ("I realized, when [the testing] was done, that I—I—my neighbor was right, I am injured. I—I didn't know it, but I do now."); *id.* ("I can see it. I can't function. I'm unable to do what I know I could do prior to the accident."); *id.* at 206 (Julie Norman recounting Brad's reaction to the Glisky test results).

7.2     He has since resolved to take things "one day at a time." *Id.* at 44; *see also id.* at 45 ("And when issues come up throughout the day that lead me to failure, based on my memory, then I have to step aside, take a breath.").

7.3     Norman has instituted "a method where [he] force[s him]self to do things two or three times in order to get it right." *Id.* at 56. He now enlists the help of his employees and "everybody around [him]" to remember "schedules or maintenance issues." *Id.* at 45–

46; *see also id.* at 49 ("[I]t just was a little embarrassing, I guess, to ask for the help."). And

he asks clients to call him so that he does not "mess up the dispatch schedule." *Id.* at 49.

7.4    Norman also uses his phone to "constantly" take notes. *Id.* at 46 ("I mean, hourly I'm writing stuff in that thing, multiple times an hour so that I can refer back to it and make sure that I haven't done something that I shouldn't be doing or do something that I should be doing."); *id.* at 48 ("Anything and everything now that is called in to me, which is many, many times a day, whether it be from a crew, a client, a supplier, so on, I have to type it into the daily calendar. I log in the note, whatever it was, a name or a phone number.").[5]

7.5    Despite these strategies, Norman often forgets what he is doing mid-task if interrupted for even a split second. *Id.* at 48; *see, e.g.*, *id.* at 16–18 (while working on a project shortly before trial, Norman forgot the depth of the concrete drill he was operating every 60 to 90 seconds and had to be repeatedly reminded by his employee); *id.* at 53–54, 56–57 (during an October 2022 camping trip, Norman was distracted by his dog and forgot to fully raise the camper jacks before driving away; he had a "meltdown" in response to this oversight and verbally lashed out at his wife); *id.* at 55, 169 (Norman went into a bait store before going out on a fishing boat and, after exiting the store, accidentally left his dog on the dock for an hour while fishing); *id.* at 58–59 (while at a jobsite, Norman mishandled wall-cutting equipment and skipped a critical step in the applicable procedure because he got distracted by his phone).

7.6    Other witnesses corroborated Norman's purported short-term memory issues. For example, Calli Norman recounted how her dad "was pretty explosive" during

---

[5] There was conflicting testimony as to whether Norman uses a paper notepad or his cell phone to take notes. *See, e.g.*, *id.* at 149–50. However, the Court finds this distinction immaterial.

his June 2022 visit to New York whenever he forgot to take his pills—something that happened "four or five times in a row." *Id.* at 124–25. She testified that Norman has always been "even-keeled, pretty even-tempered and very sharp, [with] good recollection." *Id.* at 126; *see also, e.g.*, *id.* at 127 ("[I]f I needed tires for my car when I was at college, he'd just call up Walmart, tell them what tire number without looking, or anything was just right there, accessible in the front of his mind[.]"); *id.* at 127 ("I've never seen him have to write things down or memorize. Like, it's just, once he hears it, it's there."); *id.* at 128 ("[W]ith dad, his memory, from my understanding is, once it's said, once it's internalized, it's locked in.").

7.7     According to Calli, Norman's once-sharp memory is "clearly[] something that's missing now." *Id.* at 127; *see also, e.g.*, *id.* at 129 ("I've maybe had a phone call or two where he's called me up to tell me about an exciting trip he just planned . . . , and a couple of days later, 'Hey, did I tell you about this trip we're going on?'").

7.8     Abby Norman likewise testified to the change in her father. Before the February 2017 crash, he was "quick-witted" and "rapid-fire." *Id.* at 136. Norman "used to be incredible at memorizing phone numbers" and could "recite" the number of any contractor on command. *Id.* at 136–37; *see also id.* at 137 ("He'd be like, 'Oh, the Bobcat needs to get a new oil filter. Well, that's 034,' whatever, and he could just rattle it off and go get it, instead of having to check, look, write it down, go and get it[.]"). Now, however, he will "forget turns on . . . regular routes that he's taken" for thirty years, or otherwise miss "[s]ome place he's always known[.]" *Id.* at 134.

7.9     Norman also helped Abby pay her rent between February and September 2022 by depositing money in her account. *Id.* at 135, 140. Despite this practice, Abby indicated that "probably four out of six months he would just—it would just slip his mind,

he'd forget." *Id.* at 135 ("I would try [to] preemptively remind him . . . the day before, 'Rent tomorrow, please.' And he'd say, 'Okay.' And then maybe like a week later, if I didn't get it, I'd still be, like, 'Hey, can I have it by this day?' And then I'd get a call, 'I'm so sorry, I forgot. I'll get it in right now.'").

7.10    Norman also "consistently" referred to Abby's fiancé by the wrong name for the first two and a half years after meeting him. *Id.* at 136 ("You know, he would get discouraged and apologize, like he wasn't trying to diminish my relationship at all.").

7.11    Carl Norman echoed his sisters' sentiments. He too recounted his father's ability to memorize phone numbers, credit card numbers, and addresses "almost indefinitely" and "without writing [them] down." *Id.* at 143–44. Now, however, Norman is affected by the accident "on a daily basis, not only from [not] being able to remember, for example, a client's phone number or, you know, when he might have a particular job for a client . . . but also . . . his attitude and . . . daily well-being." *Id.* at 144; *see also, e.g.*, *id.* at 145 (Norman used to remember life jackets and fishing poles before going out on the boat, but now he forgets these things); *id.* at 146 ("So there was this one occasion where he called me, and we started to talk about something. I was, like, 'Yeah, Dad, you told me this last week.'"). Thus, all three of Norman's children testified about their father forgetting previous discussions.

7.12    Clint Owens, an Olympic Concrete employee, characterized Norman's pre-crash memory as "sharp" and "very detail-oriented." *Id.* at 153. As with the other witnesses, Owens immediately noticed a change in Norman's short-term memory after the crash: "And since this incident happened, it's almost like the things that he hears, whether they're important or not . . . , they kind of go in and go out." *Id.* at 154 ("[A] lot of the things that would have never, ever, ever gone through have been—have gone through, whereas before

they would never.").

7.13    Owens further indicated that Norman's cognitive decline has affected his ability to perform their work safely and accurately. He recounted an incident in which Norman forgot to properly tighten a saw blade because he was distracted for a split second by conversation. *Id.* at 155–56. This oversight was "extremely dangerous" to Owens and Norman, as the blade "came loose" and "walked itself out." *Id.* at 156. "And that only happened because the procedure that he always, always, always has followed was not followed because of a brief loss of attention or memory in that moment." *Id.*

7.14    This and other instances of significant oversights following brief distractions corroborates Dr. Glisky's test results.

7.15    David Melnick, an employee and the next in line to take over Olympic Concrete, recounted an incident at the Bangor naval base. As office manager, Norman is responsible for providing the military with his employees' identification information so that they can gain temporary access to the base (a background check referred to as "badging in"). *Id.* at 174–75. Norman forgot to provide the information for one of his employees. *Id.* at 175. After the employee was denied access to the worksite, Norman indicated that he would send someone to pick up the employee but then forgot to do so. *Id.* at 175–76.

7.16    The most poignant example of Norman's short-term memory issues involves Melnick. Following a house fire, Norman picked up Melnick's children so that Melnick could wait for the fire marshal and seek treatment for second-degree burns. *Id.* at 176–77. Later that same day, as Melnick was leaving the hospital, Norman called him asking "where [he] was and what [he] was doing[.]" *Id.* at 177 ("[H]e had forgotten that we had already had a conversation on where and what had happened earlier that day[.]").

7.17    Melnick testified that this type of thing is "standard" for Norman and

happens "multiple times every day, whether it be going to the bank[ or] going to a job walk[.]" *Id.*; *see also, e.g., id.* at 178 ("I mean, Saturday, he was supposed to come to . . . my son's birthday party at the swimming pool, and, you know, he just forgot, forgot that it . . . was even Saturday.").

7.18    According to Eric Weikal, Norman "needs to be reminded of things fairly regularly." *Id.* at 198 ("I needed an email from him that he had gotten from a company, because they had some schematics that I needed, and I had to remind him, multiple times, to send that over to me.").

7.19    Julie Norman likewise painted a picture of her once-sharp-but-now-forgetful husband. After the February 2017 crash, Norman began forgetting what he was supposed to get at the grocery store and would call Julie for reminders. *Id.* at 205. And he often forgot to bring home flowers for Julie—another pre-collision ritual that Norman performed "a couple of times a week." *Id.*; *see also id.* at 208 ("Before this accident, he was like a computer. I could send him to the store with a list like this, and he'd remember everything. Now, something goes in front of him, he totally forgets it. It happens all the time, all the time at home.").

7.20    Olympic Concrete's business has nonetheless continued to grow in the years since the February 2017 accident. *Id.* at 104–05, 161. Norman testified that he and his five or six employees ran double shifts (and "sometimes 24 hours" at a time) to keep up with the flow of work. *Id.* at 105.

7.21    Norman now does "more and more in the office rather than in the field." *Id.*; *see also id.* at 107 (Norman's office tasks include preparing bids, preparing equipment lists for the crews, preparing job tickets, completing the quarterly taxes, handling the payroll, handling his household's personal finances, and ordering supplies). Although in a

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 18

previous deposition Norman attributed this shift in work responsibility to physical decline, at trial he claimed that it was based more on his cognitive issues. *Id.* at 105–07.

7.22    Norman characterizes his short-term memory issues as a "terrible," "nightmarish experience," and "a form of not recognizing who [he is]." *Id.* at 60 ("You know, one day I have a meltdown. Weeks can go by, and I just have to tolerate it, I just have to live with it, and adjust accordingly."). Norman feels "less than . . . what [he] used to be," a "form of . . . despair," and "deprived" of what he could have otherwise done in the time since the accident. *Id.* at 61. He plans to begin "turning over" control of Olympic Concrete to his stepson, David Melnick, and will "act as some type of advisor regarding bidding and things that aren't job-site related[.]" *Id.* at 63; *see also id.* at 90–91. This makes Norman sad because he "never intended to retire" and loves his job. *Id.* at 63.

7.23    The Court finds the testimony of friends and family conflicting when it comes to whether and to what degree Norman's short-term memory has improved. *Compare id.* at 147 (Carl Norman: "I do think he's getting better with time and—and trying to work around it."), *and id.* at 196 (Weikal: "Right after the accident, he was incredibly forgetful. He is still incredibly forgetful. But it did improve a tiny, tiny—you know, very marginally, but then it stayed the same."), *with id.* at 159 (Owens: "I mean, it started with the accident, and then progressively has been getting worse."), *id.* at 164 (Owens: "[R]egardless of how much he practices and tries to exercise his ability to memorize anything . . . I think his—that has changed and gotten worse[.]"), *id.* (Owens: "[T]he little bouts of forgetting . . . they're getting, I would say, more and more frequent."), *and id.* at 183 (Melnick: "I would say yes, they've probably [gotten worse]—I mean, but we've also gotten bigger, to where there is more work and more stuff to remember, too.").

7.24    The Court accords Weikal's, Owens', and Melnick's testimonies slightly

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 19

more weight on this point because, as Norman's full-time employees, they have spent and continue to spend the most time with him since the accident. *See, e.g.*, *id.* at 159 (Owens testifying that he is around Brad "a lot at work"); *id.* at 148 (Carl testifying that he sees his father "a few . . . times a year[,] . . . at least five to ten times a year"); *id.* at 196 (Weikal testifying that he works with Norman "on a daily basis"). On balance, their testimonies suggest that Norman's short-term memory and related mental functioning have been impaired at roughly the same level, if not worsening, since the February 2017 accident.

8.0   Dr. Glisky's January 2020 Examination

      8.1   Dr. Glisky performed a follow-up neuropsychological evaluation (including re-testing) of Norman in January 2020. *Id.* at 44–45; Ex. 9 at 14, 35, 38.

      8.2   During the evaluation, Norman reported that he was "having more difficulty managing things at work," "having to use a lot of strategies," forgetting to call people back, and forgetting to complete tasks. Ex. 9 at 37. Although his symptoms had not worsened, Norman felt that they "were more noticeable to him" and that his mood "was more up and down." *Id.* at 37–38.

      8.3   Norman indicated that the testing was "slightly different than the first time" but had "similar results." Dkt. No. 53 at 45 (testing "pretty much revealed the same thing").[6]

      8.4   Dr. Glisky's characterization of the test results comports with Norman's recollection: "there were tiny areas of improvement, but generally his areas of weakness

---

[6] Norman suggested during cross-examination that he had no memory of even seeing Dr. Glisky a second time. *Id.* at 103–04. When the Court questioned him on this inconsistency, he admitted to remembering the appointment but claimed that he saw Dr. Glisky only briefly before being passed off to a technician. *Id.* at 112–13. This is not credible. Norman's post-trial brief states that "Dr. Glisky recalled seeing Norman [in 2020] because he explained to her how traumatized he had been after the first round of testing." Dkt. No. 54 at 14 n.2. And Dr. Glisky testified that at their 2020 meeting, Norman described his experience with the 2018 evaluation in detail. Ex. 9 at 94–95.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 20

remained exactly the same." Ex. 9 at 38–39. She attributed the minor improvement to the "practice effect," which refers to the benefit or advantage of having been previously exposed to the testing. *Id.* at 38.

8.5    Dr. Glisky's opinion was unchanged following the second evaluation. That is, she still believed Norman had (1) a cognitive disorder due to a traumatic brain injury and (2) an adjustment disorder. *Id.* at 39. The only difference was that Norman exhibited an increase in symptoms of depression and anxiety. *Id.*

8.6    Dr. Glisky further opined that Norman's condition "seemed relatively stable," and she believed that his cognitive deficits "were going to be fixed and stable and continue." *Id.* In her view, any neurocognitive and functional improvements were "done" by January 2020, and there was not much more Norman could do thereafter to ameliorate his symptoms. *Id.* at 40 ("[A]nd so that would be where he was going to be probably going forward from there."); *see also id.* at 49 ("At this point, this far out, there would be no reason to see any . . . continued recovery, and he actually remains at risk for some decline.").

8.7    Following her January 2020 examination, Dr. Glisky again recommended cognitive remediation and mental health counseling. *Id.* at 89–90; *see also id.* at 35 (cognitive remediation helps the patient "use some of [his] strengths to compensate for [his] weaknesses"; this includes using "compensatory strategies like taking notes, keeping a calendar, those kinds of things"). Norman did not follow up on either option. *See* Ex. 107 at 33 (Dr. Lloyd testifying that Norman did not follow up on cognitive rehabilitation therapy or speech therapy).

9.0    Dr. Lloyd's August 2022 Examination

9.1    Dr. Lloyd interviewed Norman and performed a battery of tests in August

2022. *Id.* at 30–31. He authored a report summarizing his opinions in September 2022. *Id.* at 30.

9.2     There is a "substantial amount of overlap" between Dr. Lloyd's opinion and that of Dr. Glisky. *Id.* at 13. For example, Dr. Lloyd believes that the September 2018 testing revealed "some residual cognitive deficits" in Norman's functioning. *Id.* at 19. He likewise agrees that Norman sustained a mild traumatic brain injury as a result of the February 2017 accident. *Id.* at 13, 53. And, like Dr. Glisky, he does not believe that the August 2017 post driver incident "caused any significant injury besides the . . . scalp wound[.]" *Id.* at 13, 53.

9.3     However, Dr. Lloyd's testimony differs from Dr. Glisky's in some respects. First and foremost, he opined that Norman's cognitive difficulties "were probably due more to the psychological sequela[e] from the injury" because Norman "had very likely recovered from the concussion prior to when he saw Dr. Glisky." *Id.* at 22; *see also id.* at 49 ("I also believe that as is the case . . . for most people, that he recovered from the acute effects of that injury, and that his persisting lingering subjective complaints and the residual cognitive difficulties are not directly related to that injury.").

9.4     Dr. Lloyd opined that Norman had fully recovered as early as May or June 2017. *See id.* at 23–24 ("[I]t's notable that he reported to his . . . chiropractor by . . . I think probably by May or June of 2017 that he felt like his memory was improving or had improved. And that's pretty consistent with the recovery course that we would expect from a concussion like Mr. Norman suffered.").

9.5     With respect to psychological factors, Dr. Lloyd testified that Norman has convinced himself that he has a permanent injury:

Q: And—and that comment you just made, Doctor, about some people who

think they're never going to get better, is it your opinion that Mr. Norman
falls into that camp, that . . . based on what he told you, . . . that is his
mindset?

A: Yes. He—you know, he as much as said that he sees himself as . . . less
than. I think that was actually something . . . that he actually [said]. So he
perceives himself as having been damaged and that th[e] damage is never
going to get better.

*Id.* at 30; *see also id.* at 49–50 ("[H]e's also struggling from a psychological standpoint and

. . . that's what's really been contributing to his protracted, prolonged concussion-like

symptoms; . . . his expectation of his recovery was that it was not going to be complete,

and that this kind of served a self-fulfilling prophesy in a way.").

     9.6    Although Dr. Lloyd tied Norman's ongoing cognitive complaints to a

psychological adjustment disorder rather than the brain injury, he simultaneously conceded

that the adjustment disorder is "a consequence" of the February 2017 accident. *Id.* at 53,

62; *see also id.* at 52 (agreeing that the collision "triggered" Norman's psychological

adjustment issues).[7] And nothing in the record indicates that Norman's psychological

adjustment disorder or depression antedates the collision:

Q: We also don't have any indication that Mr. Norman was suffering from
any sort of psychological disorder prior to this motor vehicle collision?

A: That's correct.

Q: There's no indication that he had depression symptoms prior to the motor
vehicle collision?

A: Not that I have seen in the record, no.

*Id.* at 55–56.

     9.7    Dr. Lloyd also attributed Norman's memory and learning issues to

---

[7] Dr. Lloyd likewise admitted that he did not know whether Norman's cognitive deficits are attributable directly to his mild traumatic brain injury or to the psychological adjustment disorder, although the latter is his position. *Id.* at 62–63.

depression. *Id.* at 40 ("[T]hat's a pattern that we see in individuals with depression.").

9.8    Dr. Lloyd's findings are premised on another critical departure from Dr. Glisky. According to him, "the vast majority of persons with mild traumatic brain injuries recover within weeks to months." *Id.* at 22. Dr. Lloyd also testified that there is a spectrum within the category of mild traumatic brain injury. *Id.* at 25. Although the spectrum is not "particularly well defined," a mild traumatic brain injury would be considered "milder" if, for example, the individual could "describe . . . the details up to the point of collision, and then [recount] immediately after the impact what they did[.]" *Id.* Another example of a less severe mild traumatic brain injury, at least according to Dr. Lloyd, is when an individual does not have "a long duration of loss of consciousness[.]" *Id.* at 26. A person in that situation is more likely to recover from their brain injury. *Id.* Dr. Lloyd placed Norman in the "milder" category and opined that such mild injury made it more likely that Norman would be able to recover from the brain injury. *Id.* at 25–27.

9.9    A third point of disagreement between the experts involved Dr. Glisky's suggestion that Norman could have suffered retrograde or post-traumatic amnesia. Dr. Lloyd opined that Norman did not experience much of either, again placing him in the "milder" category of brain injury. *Id.* at 25, 27.

9.10    During his interview with Dr. Lloyd, Norman again confirmed that he never explored cognitive rehabilitation or speech therapy because he did not think either would help him:

> Q: [I]s this . . . where he confirmed for you that he had not received any cognitive rehabilitation therapy or speech therapy[?]
>
> A: Yes.
>
> Q: All right. Did Mr. Norman give you any indication of why he did not follow up on that suggestion?

1     A: I—I think that it was in part based on his expectation that it probably
wasn't really going to be of much benefit for him.

*Id.* at 33.

     9.11    Dr. Lloyd echoed Dr. Glisky's observation that cognitive rehabilitation "can help [people] with education in terms of understanding what to expect in terms of normal recovery course," and it gives people "tools and strategies to manage any difficulties that they might be encountering as a result of the injury that they suffered." *Id.* at 19. But here, too, Dr. Lloyd disagreed with Dr. Glisky's opinion that Norman was "done" recovering and "fixed and stable." *Id.* at 50. He instead testified that speech therapy, psychological counseling, and cognitive rehabilitation "would still be appropriate." *Id.*; *see also id.* at 18 ("[A]ny time I'm seeing somebody or evaluating records with somebody who has had any type of brain injury, cognitive rehabilitation is—could be quite beneficial. And the fact that it was recommended, as I said, was appropriate[.]").

     9.12    Dr. Lloyd's opinion that Norman fully recovered from his traumatic brain injury as early as May or June 2017 is undermined by his suggestion that cognitive rehabilitation remains "appropriate." Put differently, there would be no need for cognitive rehabilitation if Norman's brain injury was fully healed or his ongoing symptoms were attributable solely to psychological factors like depression. Indeed, Dr. Lloyd testified that the appropriate treatment for depression would be a "combination of psychological counseling[ and] medication[.]" *Id.* at 47.

10.0    <u>Summary of Key Factual Findings</u>

     10.1    The Court concludes that Norman's cognitive functioning has not returned to pre-crash levels, and that his cognitive deficits are ongoing. Nor has his mild traumatic brain injury healed.

10.2   The Court further finds that Norman's cognitive deficits have stabilized in the sense that they are not getting worse. With respect to this issue, the Court finds the testimonies of Dr. Glisky and Dr. Lloyd more persuasive than those of Norman's employees. *See* Ex. 9 at 39 ("[T]here was no substantial improvement and—and no decline. So it seemed relatively stable[.]"); *id.* at 49 ("[H]is symptoms are likely fixed and stable from the neurocognitive point of view; [and] he's been able to return to work, but has some accommodations and is not able to work up to his previous level."); Ex. 107 at 59 ("[H]is performance was the same for me as it was with Dr. Glisky, so there was no decline relative to his first evaluation[.]").

## II.   CONCLUSIONS OF LAW

1.0   The Court has diversity jurisdiction over this action because Norman is a citizen of Washington, Travelers is a citizen of Connecticut, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. §§ 1332(a)(1), (c)(1), and 1441(a).

2.0   Venue is proper in this Court because a substantial part of the events giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(b)(2).

3.0   Washington law provides the substantive law governing this case because the collision occurred in Washington. *See Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 426–27 (1996).

4.0   A valid contract for uninsured or underinsured motorist benefits existed between Norman and Travelers on February 3, 2017. Dkt. No. 55 at 3; Dkt. No. 57 at 7.

5.0   Norman has established by a preponderance of the evidence that the February 2017 collision proximately caused his mild traumatic brain injury, and that this injury caused and continues to cause ongoing cognitive deficits. His noneconomic damages are set forth below.

1    6.0    Causation

2    6.1    "The purpose of UIM coverage is to allow an injured party to recover those

3    damages the injured party would have received had the responsible party been insured with

4    liability limits as broad as the injured party's UIM limits." *Devany v. Farmers Ins. Co.*,

5    139 P.3d 352, 353 (Wash. Ct. App. 2006) (citing *Hamilton v. Farmers Ins. Co. of Wash.*,

6    733 P.2d 213, 216 (Wash. 1987)). The UIM insurer "provides a second layer of excess

7    insurance coverage that 'floats' on top of recovery from other sources for the injured

8    party." *Fisher v. Allstate Ins. Co.*, 961 P.2d 350, 352 (Wash. 1998) (quoting *Blackburn v.*

9    *Safeco Ins. Co.*, 794 P.2d 1259, 1262 (Wash. 1990)). As a result, "[t]he UIM insurer steps

10   into the shoes of the tortfeasor and may defend as the tortfeasor would defend." *Cedell v.*

11   *Farmers Ins. Co. of Wash.*, 295 P.3d 239, 245 (Wash. 2013).

12   6.2    The Court "must determine the amount of money that will reasonably and

13   fairly compensate the plaintiff for such damages as [the Court] find[s] were proximately

14   caused by the negligence of the [at-fault driver]." 6 Wash. Prac., Wash. Pattern Jury

15   Instructions: Civil 30.01.01 (7th ed. 2019); *accord Penny v. State Farm Mut. Auto. Ins.*

16   *Co.*, No. C18-5195-JLR, 2020 WL 6559288, at *10 (W.D. Wash. Nov. 9, 2020).

17   6.3    Thus, although this is a breach of contract action against Travelers, Norman

18   must show that the at-fault driver's negligence proximately caused his mild traumatic brain

19   injury and attendant ongoing cognitive deficits. *See Pedroza v. Bryant*, 677 P.2d 166, 168

20   (Wash. 1984) (a negligence action requires the plaintiff to show duty, breach, resulting

21   injury, and a proximate cause between the breach and injury); *Roemmich v. 3M Co.*, 509

22   P.3d 306, 313 (Wash. Ct. App. 2022) ("To be liable for negligence, a plaintiff must show

23   that a defendant's actions were a proximate cause of the plaintiff's injury."). A plaintiff

24   must establish causation with expert testimony "when an injury involves obscure medical

factors that would require an ordinary lay person to speculate or conjecture in making a finding." *Bruns v. PACCAR, Inc.*, 890 P.2d 469, 477 (Wash. Ct. App. 1995).

6.4    "A proximate cause of an injury is defined as the cause that, in a direct sequence, unbroken by any new, independent cause, produces the injury complained of and without which the injury would not have occurred." *Fabrique v. Choice Hotels Int'l, Inc.*, 183 P.3d 1118, 1121 (Wash. Ct. App. 2008). Proximate causation consists of two elements: cause in fact and legal causation. *Schooley v. Pinch's Deli Market, Inc.*, 951 P.2d 749, 754 (Wash. 1998). The cause in fact element traditionally "refer[s] to the 'but for' consequences of an act—the physical connection between an act and an injury." *Daugert v. Pappas*, 704 P.2d 600, 604 (Wash. 1985) ("The 'but for' test requires a plaintiff to establish that the act complained of probably caused the subsequent disability."). The legal causation element, on the other hand, "is grounded in policy determinations as to how far the consequences of a defendant's acts should extend." *Schooley*, 951 P.2d at 754. The focus of this second element "is whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." *Id.*

6.5    Both elements are established here. Dr. Glisky and Dr. Lloyd agreed that the February 2017 collision produced Norman's mild traumatic brain injury. *See Roemmich*, 509 P.3d at 315 ("An act generally is a proximate cause of an injury if it produces the injury."). Their only point of contention is whether Norman's ongoing cognitive deficits stem directly from his brain injury or are instead attributable to psychological adjustment disorder.

6.6    Norman has shown that his mild traumatic brain injury is more likely than not the primary (i.e., the but for and probable) cause of his ongoing cognitive deficits—not a psychological adjustment disorder or depression, although the latter two may be minor

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 28

contributors to his memory issues. *See Daugert*, 704 P.2d at 604 ("The 'but for' test requires a plaintiff to establish that the act complained of probably caused the subsequent disability.").

6.7     To the extent Travelers suggests that the August 2017 post driver incident constitutes a superseding cause of Norman's injuries, the Court disagrees.

6.8     The doctrine of superseding cause "applies where the act of a third party intervenes between the defendant's original conduct and the plaintiff's injury such that the defendant may no longer be deemed responsible for the injury." *Anderson v. Dreis & Krump Mfg. Corp.*, 739 P.2d 1177, 1184 (Wash. Ct. App. 1987); *see also Roemmich*, 509 P.3d at 315 ("[W]hen a new, independent act breaks the chain of causation, it supersedes the original act as the proximate cause of the injury."). Here, neither expert assigned the post driver incident any significance. That they could not completely rule it out as a contributing cause to Norman's ongoing deficits is insufficient to establish a superseding cause. *See* 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 15.05 (7th ed. 2019) (a factfinder must find that a later independent intervening cause or force was "the sole proximate cause" of the injury). Again, the mild traumatic brain injury is the primary (and likely sole) cause of the ongoing cognitive deficits.

6.9     The Court likewise rejects any suggestion that Norman's pre-February 2017 accidents resulted in a preexisting condition, that a preexisting condition is responsible for his ongoing cognitive deficits, or that the February 2017 collision aggravated a preexisting condition. "[W]henever the evidence is in dispute as to the existence of a pre-existing condition or disability, it is appropriate to use instructions based on both W[ashington] P[attern] I[nstruction] 30.17 and 30.18[.]" *Thogerson v. Heiner*, 832 P.2d 508, 513 (Wash. Ct. App. 1992).

6.10     Under Washington Pattern Instruction 30.17, if the factfinder determines that the plaintiff had a preexisting bodily or mental condition that was causing disability, and because of the occurrence at issue the condition or the disability was aggravated, the factfinder "should consider the degree to which the condition . . . or disability was aggravated by th[e] occurrence," but should not consider "any condition or disability that may have existed prior to this occurrence, or from which the [plaintiff] may now be suffering, that was not caused or contributed to by this occurrence." 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 30.17 (7th ed. 2019).

6.11     If the factfinder determines that the plaintiff had a preexisting bodily or mental condition that was *not* causing disability before the occurrence, but because of the occurrence the preexisting condition was "lighted up" or "made active," Washington Pattern Instruction 30.18 instructs that the factfinder "should consider the lighting up and any other injuries that were proximately caused by the occurrence, even though those injuries, due to the pre-existing condition, may have been greater than those that would have been incurred under the same circumstances by a person without that condition." 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 30.18 (7th ed. 2019). This instruction further provides that there may be no recovery for injuries or disabilities that would have resulted from natural progression of the preexisting condition even without the occurrence. *Id.*

6.12     Similarly, under Washington Pattern Instruction 30.18.01, if the factfinder determines that the plaintiff had a preexisting bodily or mental condition that was not causing disability before the occurrence, and the preexisting condition made the plaintiff more *susceptible* to injury than a person in normal health, the factfinder "should consider all the injuries and damages that were proximately caused by the occurrence, even though

those injuries, due to the pre-existing condition, may have been greater than those that would have been incurred under the same circumstances by a person without that condition." 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 30.18.01 (7th ed. 2019). As with Washington Pattern Instruction 30.18, though, there can be no recovery for injuries or disabilities that would have resulted from natural progression of the preexisting condition even without the occurrence. *Id.*[8]

6.13    Here, the evidence is not really in dispute. *See Thogerson*, 832 P.2d at 513. As with the post driver incident, neither expert apportioned much (if any) weight to the pre-February 2017 accidents. Nor does the Court. And while it is true that Norman's previous accidents may have predisposed him to a more severe subsequent brain injury, there is insufficient evidence for the Court to conclude that Norman had a preexisting cognitive disability as a result of those earlier injuries.

7.0    Noneconomic Damages

7.1    The Court now turns to Norman's noneconomic damages. *See* Dkt. No. 36 at 12–18; Dkt. No. 54 at 17–20. Norman values his damages at $3,726,777 "for the loss of the essence of who he is." Dkt. No. 54 at 19–20 (seeking $1,310,400 in past noneconomic damages and $2,416,377 in future noneconomic damages). Travelers' estimate is considerably lower. It contends that a "fair and reasonable value for approximately six months [of] recover[y] from a concussion and ongoing . . . psychological sequ[e]lae is the sum of $100,000[.]" Dkt. No. 56 at 6.

7.2    In Washington, noneconomic damages "means subjective, nonmonetary

---

[8] This instruction embraces "the fundamental notion that 'a tortfeasor takes his victim as he finds him, and must bear liability for the manner and degree in which his fault manifests itself on the individual physiology of the victim.'" *Id.*, cmt. (quoting *Buchalski v. Universal Marine Corp.*, 393 F. Supp. 246, 248 (W.D. Wash. 1975)).

losses including, but not limited to, pain, suffering, inconvenience, mental anguish, disability or disfigurement incurred by the injured party, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation, and destruction of the parent-child relationship." Wash. Rev. Code § 48.140.010(10).[9] The term "disability" encompasses not only the incapacity to work, but also impairment of a plaintiff's ability to lead a normal life. *Penny*, 2020 WL 6559288, at *12 (citing *Parris v. Johnson*, 479 P.2d 91, 95 (Wash. Ct. App. 1970)).

7.3     The claimant bears the burden of proving the amount of damages and must come forward with sufficient evidence to support a damages award. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 315 P.3d 1143, 1150 (Wash. Ct. App. 2013). However, "the precise amount of damages need not be shown with mathematical certainty[.]" *Id.*; *see Lewis River Golf, Inc. v. O.M. Scott & Sons*, 845 P.2d 987, 990 (Wash. 1993) ("[T]he doctrine respecting the matter of certainty, properly applied, is concerned more with the fact of damage than with the extent or amount of damage." (cleaned up)). Evidence of damage is therefore sufficient "if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture." *Clayton v. Wilson*, 227 P.3d 278, 285 (Wash. 2010) (cleaned up).

7.4     Noneconomic damages are "especially" within the factfinder's discretion. *Evans v. Firl*, 523 P.3d 869, 880 (Wash. Ct. App. 2023). This is because they are "not

---

[9] Effective July 23, 2023, the Washington legislature repealed Section 4.56.250 and recodified the noneconomic damages definition in Section 48.14.010. *See* Laws 2023, ch. 102, § 5 (SSB 5087). This amendment was slated along with several others as part of an annual report produced by the Washington Supreme Court identifying "defects and omissions in the laws[.]" Wash. Const. art. IV, § 25. It comes in response to the Washington Supreme Court's 1989 decision in *Sofie v. Fireboard Corporation*, which found that Section 4.56.250's cap on noneconomic damages violated the jury trial right enshrined in Article I, Section 21 of the Washington State Constitution. 771 P.2d 711, 712–13 (Wash. 1989); *see* SSB 5087 Substitute House Bill Analysis, Washington State House of Representatives Office of Program Research - Civil Rights and Judiciary Committee, *available at* https://app.leg.wa.gov/billsummary?billnumber=5087&year=2023 (last visited Sept. 7, 2023).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 32

susceptible of precise measurement" and "cannot be fixed with mathematical certainty[.]" *Wagner v. Monteilh*, 720 P.2d 847, 849 (Wash. Ct. App. 1986) (cleaned up); *see also* 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 30.01.01 (7th ed. 2019) ("The law has not furnished us with any fixed standards by which to measure noneconomic damages. With reference to these matters you must be governed by your own judgment, by the evidence in the case, and by these instructions."). Noneconomic damages therefore need not be reduced to present cash value. 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 34.02 (7th ed. 2019). And a damages verdict may rest on the plaintiff's testimony alone. *Pendergrast v. Matichuk*, 379 P.3d 96, 102 (Wash. 2016). "In awarding noneconomic damages, the Court may not be swayed by passion or prejudice and must 'maintain some degree of uniformity in cases involving similar losses,' while also minding that '[e]ach case stands on its own facts.'" *Lo v. United States*, No. 2:17-CV-01202-TL, 2023 WL 2014331, at *21 (W.D. Wash. Feb. 15, 2023) (alteration original) (quoting *Shaw v. United States*, 741 F.2d 1202, 1209 (9th Cir. 1984)).

7.5     Norman presented sufficient evidence to establish that his mild traumatic brain injury and attendant cognitive deficits impaired his ability to lead a normal life, caused mental anguish and emotional distress, and resulted in the loss of enjoyment of life. There is also a reasonable probability that his injury and ongoing symptoms will continue to impair his ability to lead a normal life, cause mental anguish and emotional distress, and result in the loss of enjoyment of life. *See* 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 30.01.01, 30.05, and 30.06 (7th ed. 2019). Norman's testimony, along with his children's, wife's, and employees' testimonies, indicate that his memory issues and related moodiness have impacted his relationships with those people. He experienced and will continue to experience mental anguish and emotional distress because his once-sharp

(essentially photographic) memory has been reduced to taking constant notes. And even then, he forgets basic things that were once cognitive muscle memory.

7.6      Norman testified that he does not recognize himself at times and is "devastated" by his memory issues and feels "less than." His wife and children corroborated the range of emotions he has experienced, from rage and frustration to despair. *See Bunch v. King Cnty. Dep't of Youth Servs.*, 116 P.3d 381, 389 (Wash. 2005) (noting that distress "need not be severe," and upholding noneconomic damages award premised on "limited" evidence of emotional distress). Indeed, the testimony in this case painted a clear and poignant picture of two Normans: one before the February 2017 crash and one after. The latter Norman forgets notable—sometimes seismic—events, like a fire at his stepson's house just hours after being there; critical procedural safety measures for operating concrete cutting equipment; and roads or directions that he has taken for more than two decades. The injuries he sustained in the February 2017 crash forced Norman to alter his life in significant ways. *See, e.g.*, *Ream v. United States*, No. 17-1141-RAJ, 2020 WL 1303429, at *7 (W.D. Wash. Mar. 19, 2020) (awarding noneconomic damages where injuries prevented plaintiff from returning to her "previous occupation and way of life"). Contrary to Travelers' assertion, this is not a case in which Norman simply "forgot his dog once on the beach[.]" Dkt. No. 56 at 6.

7.7      Throughout trial, Travelers' counsel elicited testimony suggesting that Norman continues to pursue his hobbies (e.g., fishing, camping, hunting, and boating with family) relatively unabated by his cognitive deficits; that he still participates in Olympic Concrete's daily operations (e.g., he performs administrative and financial tasks); and that Olympic Concrete is more successful than ever. *See, e.g.*, Dkt. No. 56 at 5; Ex. 100 (customer purchase history printout from the Washington Department of Fish and Wildlife

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 34

reflecting that Norman purchased fishing and crabbing licenses in 2020 and 2021); Exs. 101–05 (photographs of Norman fishing). The Court rejects any suggestion that Norman's ability to continue his life with some personal enjoyment and success negates his injuries. *See Steele v. Nat'l R.R. Passenger Corp.*, 599 F. Supp. 3d 1039, 1051 (W.D. Wash. 2022) ("Amtrak's view that passengers who can continue to live their lives with some personal enjoyment cannot be injured in [a] way worthy of substantial compensation is misplaced, it is not supported by the evidence, and it is not the law.").

       7.8     Quantifying Norman's past and future noneconomic damages presents a more difficult question.[10] As noted above, this is not an exact science. *See Wagner*, 720 P.2d at 849. The Court has reviewed other decisions awarding noneconomic damages for brain injuries that range in severity from mild to severe and incapacitating. It relies on those cases as data points. *See Grajales-Romero v. Am. Airlines, Inc.*, 194 F.3d 288, 300 (1st Cir. 1999) (upholding jury's award of $150,000 in damages for continued "neck pain and loss of cognitive functions, including concentration and memory"); *Bradley v. United States*, 619 F. Supp. 3d 141, 190 (D.D.C. 2022) (awarding $12,000 per year in noneconomic damages for past and present emotional and physical suffering related to a mild traumatic brain injury where plaintiff was "not completely incapacitated" but her permanent symptoms were "not insignificant"); *Penny*, 2020 WL 6559288, at *4–5, 12 (awarding $92,000 in noneconomic damages for one year of pain and suffering and loss of enjoyment of life where automobile accident caused a mild traumatic brain injury; cervical, thoracic,

---

[10] At the outset, the Court notes that neither party provided any citations to cases involving noneconomic damages awards for similar circumstances and injuries, despite the Court's clear and repeated directive that they should focus their post-trial briefs on how the Court must quantify damages. *See* Dkt. No. 54 at 17–21 (citing to no cases, and instead fashioning convoluted, inapt analogy about the "essence" of a Bugatti, Russell Wilson, and a piece of art by Maurizio Cattelan); Dkt. No. 56 at 2–7 (summarizing trial testimony before conclusorily stating that Norman's noneconomic damages are $100,000 reduced by 50% for failure to mitigate). This kind of failure to follow basic directions frustrates the swift and efficient administration of justice.

lumbosacral, bilateral knee, and bilateral ankle sprain and strain injuries; and the exacerbation of preexisting writ and thumb pain); *Rufo v. United States*, No. CV-18-2138-PSG (ASx), 2020 WL 968973, at *1, 4 (C.D. Cal. Feb. 28, 2020) (awarding $500,000 for roughly four years of past noneconomic damages and $1,500,000 for future noneconomic damages where plaintiff suffered a mild traumatic brain injury in automobile accident; plaintiff's symptoms included headaches, neck pain, dizziness, nausea, vertigo, vision problems, memory defects, depression, and balance issues, and the accident rendered him permanently disabled and unable to drive); *Calva-Cerqueira v. United States*, 281 F. Supp. 2d 279, 287–90, 294–95 (D.D.C. 2003) (awarding $5,000,000 in past and future noneconomic damages for pain, suffering, and mental anguish where automobile accident caused severe and permanent brain damage; dementia; multiple emotional, cognitive, and behavioral problems requiring ongoing psychiatric treatment; physical disabilities; disfigurement; paralysis; decreased sensation; loss of physical strength; deformity; and inconvenience).

7.9     The Court assesses noneconomic damages in the amount of $25,000 per year based on these cases. And it multiplies this amount by 23.01 years, Norman's expected lifespan as of the date of the injury—and the length of time that Norman has or will experience mental anguish, emotional distress, and loss of enjoyment of life as a result of his mild traumatic brain injury and attendant cognitive deficits. *See* 6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 34.04 & Appendix B (7th ed. 2019).[11] Courts have used this method to calculate total noneconomic damages. *See, e.g.*, *Trautt v. Keystone RV Co.*, No. 2:19-CV-00342-RAJ, 2021 WL 3525157, at *9 (W.D. Wash. Aug. 11, 2021); *Bradley*,

[11] As noted above, Norman was 58 on the date of the crash. And his nearest birthday relative to the date of the collision was his 58th birthday in 2016.

619 F. Supp. 3d at 190. The Court therefore awards Norman $575,250 for past and future mental anguish, emotional distress, and loss of enjoyment of life.

7.10    And last, the Court must compensate Norman for past physical pain stemming from the accident. *See* Wash. Rev. Code § 48.140.010(10). Norman testified that he experienced lower back and neck pain, knee pain, and headaches in the immediate aftermath of the collision. *See, e.g.*, Dkt. No. 36 at 13 (seeking to recover for "neck pain, mid-back pain, low back pain, knee pai[n], and headaches"). He sought chiropractic treatment from Dr. Lawrence, however, and the parties do not dispute that his physical symptoms resolved within three to six months of the accident. The Court therefore awards Norman noneconomic damages for the physical pain he experienced between February and June 2017, when he completed treatment with Dr. Lawrence.

7.11    Here too the Court looks to other decisions awarding noneconomic damages for similar pain and uses those as benchmarks. *See Carson v. United States*, No. C18-5858-MJP, 2021 WL 3124516, at *2, 7–8 (W.D. Wash. July 23, 2021) (awarding $200,000 in noneconomic damages for diminished enjoyment of life, humiliation and loss of dignity, and ongoing back and neck pain); *Penny*, 2020 WL 6559288, at *8, 12 (awarding $92,000 for one year of pain and suffering and past loss of life where plaintiff experienced neck, back, knee, and ankle pain from cervical, thoracic, lumbosacral, bilateral knee, and bilateral ankle sprain and strain injuries); *Ream*, 2020 WL 1303429, at *1–2, 6 (awarding $100,000 in noneconomic damages for roughly seven years of past pain, suffering, and disability where plaintiff experienced neck and lower back pain, and needed assistance tying her shoes, putting on clothes, bathing, and going to the bathroom); *Peltier v. United States*, No. 2:16-CV-00774-ODW (SPx), 2017 WL 4621544, at *2, 5 (C.D. Cal. Oct. 16, 2017) (awarding $2,500 in noneconomic damages for back pain, suffering, and anxiety stemming

from minor rearend collision); *Cantu v. United States*, No. CV-14-00219-MMM (JCGx), 2015 WL 4720580, at \*2–5, 13–15, 36 (C.D. Cal. Aug. 7, 2015) (awarding $15,000 in noneconomic damages for past mild back, neck, and shoulder pain stemming from a moderately severe collision where plaintiff's automobile spun clockwise and rolled onto its roof; plaintiff remained secured in his seat and walked away from the wreckage). Based on these cases, the Court awards Norman an additional $7,000 for the approximately five months of pain proximately caused by the collision.

7.12    The Court therefore awards Norman noneconomic damages in the total amount of <u>$582,250</u> for (1) past and future mental anguish, emotional distress, and loss of enjoyment of life ($575,250); and (2) past, since-resolved headaches and lower back, neck, and knee pain ($7,000). This award reasonably and fairly compensates Norman for the injuries proximately caused by the February 2017 collision.

8.0    <u>Failure to Mitigate</u>

8.1    Travelers contends that Norman failed to take reasonable steps to mitigate his damages. Dkt. No. 56 at 7 ("Here, substantial expert evidence was presented that plaintiff failed to mitigate his damages."). Accordingly, it urges the Court to "apply a 50% reduction in any award to appropriately reflect this failure to mitigate." *Id.* at 12. Travelers does not explain how it arrived at a 50% reduction or otherwise discuss why that specific percentage is appropriate.

8.2    Norman disagrees with Travelers. He argues that Dr. Glisky and Dr. Lloyd testified only that cognitive rehabilitation, psychological counseling, and speech therapy "**<u>could be</u>**" beneficial. Dkt. No. 54 at 17 (emphasis original). Neither expert, he says, ever indicated "that, on a more probable than not basis, it **<u>would have</u>** helped [him]." *Id.* ("The mere fact that the treatment could have helped is insufficient to support an unreasonable

failure to mitigate affirmative defense."). According to Norman, the Court will be "forced to speculate not only about any potential benefit that [he] maybe, could have experienced" from the recommended treatment, "but also about the degree to which any treatment would have benefited [him]." *Id.* at 14, 16–17. Norman therefore suggests that the evidence is too speculative when it comes to failure to mitigate. The Court agrees.

8.3     "An injured person may not recover damages proximately caused by that person's unreasonable failure to mitigate." *Fox v. Evans*, 111 P.3d 267, 267 (Wash. Ct. App. 2005); *see Young v. Whidbey Island Bd. of Realtors*, 638 P.2d 1235, 1237 (Wash. 1982) (the injured party has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages"); *Cobb v. Snohomish Cnty.*, 935 P.2d 1384, 1389 (Wash. Ct. App. 1997) ("The doctrine of avoidable consequences, also known as mitigation of damages, prevents recovery for damages the injured party could have avoided through reasonable efforts.").

8.4     This doctrine is codified in the Revised Code of Washington, which makes clear that a plaintiff's failure to mitigate must be the proximate cause of the allegedly avoidable damages. *See* Wash. Rev. Code § 4.22.005 ("In an action based on fault seeking to recover damages for injury or death to person . . . , any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable to the claimant's contributory fault[.]"); *id.* § 4.22.015 (defining "fault" to include the "unreasonable failure . . . to mitigate damages," and stating that the "[l]egal requirements of causal relation apply both to fault as the basis for liability and to contributory fault").

8.5     Travelers bears the burden of proving that Norman unreasonably failed to mitigate his damages. *Cox v. Keg Rests. U.S., Inc.*, 935 P.2d 1377, 1380 (Wash. Ct. App.

1997). "Expert testimony is required in cases where a determination of causation turns on obscure medical factors." *Id.* And the expert testimony "must establish that the [proposed] treatment would more likely than not improve or cure the plaintiff's condition." *Fox*, 111 P.3d at 271; *see also Salisbury v. City of Seattle*, 522 P.3d 1019, 1029 (Wash. Ct. App. 2023). This is "because it is not unreasonable for a plaintiff to refuse treatment that offers only a possibility of relief." *Cox*, 935 P.2d at 1380.[12] Additionally, the evidence must "allow a [factfinder] to segregate the damages" attributable to the plaintiff's failure to mitigate "so that the [factfinder] does not base its decision on speculation." *Fox*, 111 P.3d at 271. Where "no witness testifie[s] that . . . the proposed treatments would, to a reasonable degree of medical certainty, more likely than not have led to any level of improvement," it leaves "no evidence allowing the [factfinder] to reasonably segregate any damages that could reasonably have been avoided if [the plaintiff] had made different decisions about treatment." *Salisbury*, 522 P.3d at 1030.

8.6     Two Washington Pattern Instructions reflect these requirements. The first is Washington Pattern Instruction 33.01, which states the following:

> A person who is liable for an injury to another is not liable for any damages arising after the original [*injury*] [*event*] that are proximately caused by failure of the injured person to exercise ordinary care to avoid or minimize such new or increased damage.
>
> (Insert name of applicable party) has the burden to prove (insert name of other party)'s failure to exercise ordinary care and the amount of damages, if any, that would have been minimized or avoided.

6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 33.01 (7th ed. 2019). The committee

---

[12] The court in *Cox* also held that the issue of mitigation should not go to the factfinder "if the evidence shows that a proposed treatment might not be successful or if there is conflicting testimony as to the probability of a cure[.]" *Id.* In *Fox*, however, the court rejected the suggestion that this language meant "a mitigation instruction is never proper when there is conflicting testimony" because such a reading "would virtually eliminate mitigation instructions in cases involving expert testimony." 111 P.3d at 269 ("*Cox*, including the generalized statements regarding mitigation, must be read in light of the particular facts presented.").

notes for this instruction advise courts to use it only if (1) there is evidence creating an issue of fact as to the injured person's failure to exercise ordinary care in minimizing or avoiding damages, and (2) the evidence permits a segregation of the damages resulting from that failure to exercise ordinary care. *Id.*; *see also Sutton v. Shufelberger*, 643 P.2d 920, 923 (Wash. Ct. App. 1982) (approving Washington Pattern Instruction 33.01 and stating that it should be given "whenever substantial evidence is presented creating an issue for the jury as to the injured person's duty to mitigate").

        8.7    The second instruction, Washington Pattern Instruction 33.02, mirrors Washington Pattern Instruction 33.01 but includes more specific directives tailored to situations (like Norman's) where the injured party fails to secure or submit to medical treatment:

> A person who is liable for an injury to another is not liable for any damages arising after the original [injury] [event] that are proximately caused by failure of the injured person to exercise ordinary care to avoid or minimize such new or increased damages.

> In determining whether, in the exercise of ordinary care, a person should have secured or submitted to medical treatment, as contended by (insert name of applicable party), you may consider [the nature of the treatment,] [the probability of success of such treatment,] [the risk involved in such treatment,] [(other factors in evidence),] and all of the surrounding circumstances.

> (Insert name of applicable party) has the burden to prove (insert name of other party)'s failure to exercise ordinary care and the amount of damages, if any, that would have been minimized or avoided.

6 Wash. Prac., Wash. Pattern Jury Instructions: Civil 33.02 (7th ed. 2019). The committee notes advise courts to use Washington Pattern Instruction 33.01 instead of Washington Pattern Instruction 33.02 "[f]or issues about avoidable consequences other than failing to secure or submit to medical treatment[.]" *Id.* And they again suggest that, as with Washington Pattern Instruction 33.01, a court should give Washington Pattern Instruction

33.02 only when two preconditions are met: (1) there is evidence creating an issue of fact as to the person's failure to exercise ordinary care in receiving or submitting to medical treatment, and (2) the evidence permits a segregation of the damages resulting from that failure to exercise ordinary care. *Id.*; *see also Hawkins v. Marshall*, 962 P.2d 834, 838 (Wash. Ct. App. 1998) (approving the two-element test for determining when Washington Pattern Instruction 33.02 should be given to the jury); *Helmbreck v. McPhee*, 476 P.3d 589, 600 (Wash. Ct. App. 2020) (same).

       8.8     Here, Norman repeatedly declined to pursue cognitive rehabilitation, speech therapy, or psychological counseling despite the recommendations of Dr. Rubenstein and Dr. Glisky. But Travelers does not carry its burden of establishing, on a more-likely-than-not basis, that such treatment would have improved or cured his cognitive deficits. Nor does it establish that Norman's omissions are the proximate cause of any additional or otherwise avoidable damages. Neither Dr. Glisky nor Dr. Lloyd testified that Norman's failure to pursue cognitive rehabilitation or speech therapy more likely than not impeded his recovery or aggravated his traumatic brain injury and ongoing cognitive deficits. Nor did either expert testify that cognitive rehabilitation or speech therapy more likely than not would have improved or cured his cognitive deficits. They testified only that such treatment "can" help some people (although not all) and that it "could" benefit someone with cognitive deficits like Norman's.

       8.9     Notably, after agreeing that his opinions would be provided on a "more probable than not" basis unless otherwise stated, Ex. No. 107 at 7–8, Dr. Lloyd testified that "any time [he is] seeing somebody . . . who has had any type of brain injury, cognitive rehabilitation is—could  be quite beneficial," *id.* at 18. Thus, Dr. Lloyd did not opine that cognitive rehabilitation "is" definitively beneficial, only that it "could be."

8.10    Indeed, the expert testimony in this case is similar to that in *Cox* and far more equivocal than that in *Fox*. Compare *Cox*, 935 P.2d at 1380 (experts testified that (1) "it might have been useful to consider" removing plaintiff's shunt, not "to a reasonable degree of medical certainty that revision or elimination was necessary or would alleviate [his] headaches"; (2) anti-depressants and physical therapy "might have hastened [plaintiff]'s recovery," not that a refusal to do so "prolonged [his] recovery"; and (3) plaintiff "could possibly have benefitted by engaging in [speech] therapy earlier," not that his delay in seeking such treatment "prolonged [his] recovery" (cleaned up)), *with Fox*, 111 P.3d at 268 (experts testified that (1) plaintiff was "worse off than she was [when] taking certain medications" and "had the potential for moderate improvement by taking medication"; (2) plaintiff had "a 30 percent reduction in her stress reactivity" following a first set of treatments and, if she continued treatment, an "anticipated . . . additional 50 percent improvement"; (3) plaintiff's reluctance to treat her condition "was a significant impediment to her recovery" and she "would have a better chance of recovery if she would treat her depression"; (4) plaintiff's functioning "would be better" had she received treatment within a year of the accident; (5) plaintiff "had effectively dealt with some of her symptoms with medication in the past" and "could get back to 90 percent of her functioning if she would follow the treatment suggested by her doctors and therapists"; and (6) plaintiff would "return to her baseline" with treatment (cleaned up)).

8.11    A recommendation to pursue certain treatment is not synonymous with a likelihood of improvement or recovery. And the testimony on which Travelers relies establishes only a possibility that the recommended treatment might have alleviated Norman's symptoms or otherwise accelerated his recovery. *See Cox*, 935 P.2d at 1380 ("A mere possibility of benefit is insufficient."). Again, Travelers bears the burden of

1     establishing that Norman failed to mitigate his damages. Washington law makes clear that

2     principles of proximate causation apply to this inquiry—that is, Travelers must show that

3     Norman's acts or omissions (i.e., his failure to follow Dr. Rubenstein's and Dr. Glisky's

4     recommendations) proximately caused new injuries (i.e., aggravated his cognitive deficits)

5     or impeded or prolonged his recovery such that his damages would have otherwise been

6     minimized or avoided. Travelers has failed to do so. *See Hawkins*, 962 P.2d at 838–39

7     (affirming trial court's refusal to give Washington Pattern Instruction 33.02; although

8     plaintiff failed to follow her doctor's advice and seek follow-up care, defendant presented

9     no testimony or other evidence that plaintiff's omissions "aggravated her conditions or

10    delayed recovery"); *Salisbury*, 522 P.3d at 1030 (33.02 instruction was foreclosed by

11    absence of nonspeculative testimony that, to a reasonable degree of medical certainty,

12    treatment would more likely than not have improved the plaintiff's condition).

13        8.12    Travelers highlights Dr. Lloyd's testimony that depression is "absolutely

14    treatable," and that a combination of counseling and medication is "quite effective" in

15    treating depression. Ex. 107 at 47; *see* Dkt. No. 56 at 11. First, the Court reiterates its

16    finding that Norman's traumatic brain injury is the primary cause of his ongoing cognitive

17    deficits (Dr. Glisky's opinion), rather than an adjustment disorder, depression, or other

18    psychological sequelae (Dr. Lloyd's opinion). Second, even assuming Dr. Lloyd's

19    testimony is sufficient to establish that it was reasonable for Norman to seek counseling

20    and medication (in addition to or instead of cognitive rehabilitation), and that such

21    treatment would more likely than not cure or mitigate Norman's injury, the evidence is

22    insufficient for the Court to segregate damages attributable to Norman's failure to treat his

23    depression from those that are not. The Court would therefore have to speculate as to the

24    appropriate reduction of the noneconomic damages award. This it cannot do. *See Fox*, 111

1  P.3d at 271.

2  9.0   <u>Affirmative Defenses</u>

3     9.1   The Court dismisses Travelers' fourth, fifth, sixth, seventh, eighth, and

4  ninth affirmative defenses in accordance with its findings and conclusions. *See* Dkt. No. 7

5  at 8 (answer asserting affirmative defenses).

6     9.2   Travelers' first, second, third, and tenth affirmative defenses pertain to or

7  are affected by offset. *See id.* at 7–8; Dkt. No. 38 at 8 & n.2. The Court therefore cannot

8  yet rule on these.

9  ### III.   CONCLUSION

10  The Court awards Norman $582,250 in noneconomic damages. The parties shall submit

11  briefing on the issue of offset no later than December 27, 2023. The parties' briefs shall not exceed

12  2100 words each, and should identify the relevant policy language, any amount(s) already

13  recovered by Norman, and any other issues relevant to offset. Any portion of the briefs that relies

14  on declarations or other parts of the record shall contain citations directing the Court to the relevant

15  portion of the declaration or record. Following receipt of this briefing, the Court may order the

16  parties to submit supplemental findings of fact and conclusions of law. It will set a deadline for

17  those, if necessary, upon receipt of the parties' offset briefing.

18  Dated this 4th day of December, 2023.

19

20  Lauren King
   United States District Judge

21

22

23

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 45